**IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI**

**NO. 2024-CA-00385-COA**

IN THE INTEREST OF T.L., A MINOR, T.L., A                    APPELLANT
MINOR, T.L., A MINOR, T.L., A MINOR:
JESSICA L.

v.

FORREST COUNTY DEPARTMENT OF THE                    APPELLEES
MISSISSIPPI DEPARTMENT OF CHILD
PROTECTION SERVICES, BY ANDREA A.
SANDERS AND T.L., T.L., T.L., AND T.L.,
MINORS, BY AND THROUGH THEIR NEXT
FRIEND, ANDREA A. SANDERS AND
MISSISSIPPI DEPARTMENT OF CHILD
PROTECTION SERVICES

DATE OF JUDGMENT:           02/13/2024
TRIAL JUDGE:                HON. CAROL JONES RUSSELL
COURT FROM WHICH APPEALED:  FORREST COUNTY YOUTH COURT
ATTORNEY FOR APPELLANT:     JENNA DARLENE HOLMES
ATTORNEY FOR APPELLEES:     OFFICE OF THE ATTORNEY GENERAL
                            BY: KRISTI DUNCAN KENNEDY
NATURE OF THE CASE:         CIVIL - DOMESTIC RELATIONS
DISPOSITION:                AFFIRMED - 07/21/2026
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., LAWRENCE AND EMFINGER, JJ.**

**BARNES, C.J., FOR THE COURT:**

¶1.     Jessica L. appeals the Forrest County Youth Court's judgment terminating her

parental rights to four of her seven children. Jessica claims that the youth court erred in

finding the Forrest County Department of Child Protection Services (CPS) made reasonable

efforts to reunify the four children with her. Additionally, she argues her counsel was

ineffective at the termination-of-parental-rights hearing. We find no merit to these

arguments and affirm.

¶2. Jessica's four children at issue in this appeal are, in chronological order: TL2,[1] a female child born in July 2017; TL1 and TL3, twin male children born in August 2018; and TL4, a female child born in March 2020.[2] Jordan is the putative father of TL1, TL3 and TL4. Taylor is the putative father of TL2.[3]

***Procedural History***

¶3. In May 2019, Forrest County CPS received a report of suspected abuse of TL1 after a hospital visit. Upon investigation, CPS also became concerned about dangerous sleeping conditions for TL2 and TL3. On November 26, 2019, the Forrest County Youth Court removed TL1, TL2, and TL3[4] from Jessica's custody and placed them in the custody of Forrest County CPS. The youth court removed TL1 from Jessica's home due to physical neglect with unexplained, non-accidental physical injuries. TL2 and TL3 were removed because the children's home environment posed an immediate danger to the children. At the time, the twins (TL1 and TL3) were approximately eighteen months old, and TL2 was

---

[1] We shall use the same initials as in the Appellees' brief and transcript of the termination of parental rights hearing to prevent confusion and protect the minors' identities.

[2] Jessica has a total of seven children, three of whom are not a part of this appeal. TK5 and TK6 were Jessica's first children: a female child born in June 2013 and a male child born in August 2015, respectively. Those two children also had a history of custody with CPS but were released back to Jessica's custody in April 2022. TK7 is Jessica's youngest child, a female born in September 2021. TK7 has never been in CPS custody.

[3] We use fictitious names of the putative fathers and foster parents to protect the children's privacy. There is also an "unknown putative father" listed for the four children.

[4] TL4 was not yet born.

approximately two years old. At this time, Jessica entered into a family service plan with CPS, which required her to complete several goals and tasks to improve her abilities as a parent, with the ultimate goal being reunification with her children. In March 2020, TL4 was born in Jones County, where Jessica had recently moved.

¶4. On April 14, 2020, after a hearing, the Forrest County Youth Court entered an adjudication order finding TL1, TL2, and TL3 were neglected children.[5] The parties did not dispute the veracity of the allegations in the petition. The youth court ordered a permanency plan of "Reunification with a Parent or Primary Caretaker" and a concurrent plan of "Durable Legal Custody or Legal Guardianship." The youth court entered a disposition order the same day, placing each of the three children in the custody of CPS.

¶5. In September 2020, the Jones County Youth Court held a shelter hearing for TL4 after CPS received allegations of neglect. The youth court removed her from Jessica's custody, placing her in the custody of the Jones County CPS. TL4 was approximately five months old. In October 2020, a disposition hearing was held for TL4, after which the youth court ordered a permanency plan of "Reunification with a Parent or Primary Caretaker" and a concurrent plan of "Custody with a Relative." The Jones County Youth Court transferred TL4's case to the Forrest County Youth Court and custody of TL4 to the Forrest County CPS because Forrest County had jurisdiction over her siblings.

¶6. Through 2020 and 2021, review and permanency hearings occurred on a regular basis, and orders were entered for each child, noting Jessica's progress towards the

_____

[5] TL1's status was changed from abused to neglected.

3

permanency plan of reunification, with the concurrent plan being durable legal custody or guardianship. However, on March 1, 2022, the Forrest County Youth Court issued a "Review Hearing Order," finding the permanency plan for reunification was "no longer appropriate" and not in the children's best interest. The court changed that plan to "adoption," with the concurrent plan becoming "Reunification with a Parent or Primary Caretaker." Numerous review hearing orders continued to be issued after hearings, giving status updates on CPS and Jessica's progress. On July 26, 2023, Forrest County CPS petitioned the youth court to terminate Jessica's parental rights to the four children. In August 2023, Shronda Carter was appointed guardian ad litem (GAL) for the children.

¶7. On November 17, 2023, the Forrest County Youth Court held a termination of parental rights hearing, a transcription of which is included in our record.[6] Witnesses testifying at the hearing were Shawnesty Mays, a social worker with CPS; Anna, the foster mother of the twins (TL1 and TL3); and Jessica. On February 12, 2024, the youth court issued a judgment terminating Jessica's parental rights.[7] Jessica timely appealed.

### *Termination of Parental Rights Hearing*

#### *Shawnesty Mays's Testimony*

¶8. At the termination of parental rights hearing, Mays testified about the neglect of the children, the abuse of TL1, and CPS's efforts towards reunification of the family and its

---

[6] None of the other numerous review or permanency hearings were transcribed for the record.

[7] The court continued entering review hearing orders after the termination of parental rights judgment as well, giving updates on CPS, Jessica, and the children.

barriers. Both putative fathers knew the children were in CPS custody, but as of the time of the hearing, they had not had any recent contact with the agency or the children. Mays testified that CPS became involved after reports of physical abuse. In May 2019, CPS received a report of suspected abuse of TL1, who sustained multiple fractures and an eye injury. Mays testified that upon investigation, the agency determined that TL1 was likely abused. The agency also had concerns regarding "safe sleep" for TL2 and TL3 (who were approximately two years old and nine months old, respectively) because they were sleeping in bunk beds. Therefore, in November 2019, TL1, TL2, and TL3 were removed from Jessica's custody and later adjudicated neglected children.

¶9. Mays testified that in November 2019, Jessica entered into a family service plan with CPS as part of the reasonable efforts at reunification ordered by the youth court. The agency met with Jessica to create tasks and goals to be included in the agreement.[8] Mays testified: "The overall goal was to ensure safety and well-being of the children. Jessica was to complete parenting classes, maintain contact with the agency, maintain visitation, obtain and maintain employment, and maintain stable housing." Mays testified that Jessica completed parenting classes but failed to maintain stable housing and employment.

¶10. In September 2020, Mays testified that CPS received a report of neglect of TL4. Jones County CPS investigated and found Jessica's home unsafe for TL4. The five-month-old child had no safe place to sleep, and the house contained animal feces and urine. CPS took TL4 into custody and adjudicated her a neglected child.

---

[8] Jordan was included in these discussions but never entered into an agreement with CPS and failed to remain in contact with it.

¶11. Mays testified about another report of possible physical abuse when TL1, TL2, and TL3 had a visit with Jessica on the weekend of May 19, 2023. TL1 returned with a bump on his forehead and an injury to his scalp as if his hair had been pulled. Due to these injuries, on May 31, 2023, forensic interviews of TL1 and TL3 were conducted at a local children's advocacy center to investigate. Recordings of these interviews, as well as an "interview summary" document, were admitted into evidence without objection. TL3 admitted that Jessica "whoops" him and that it hurts; but he was unsure if the whippings left marks or bruises. TL3 stated that Jessica whips TL1 on his "booty with a flashlighter," which leaves marks and bruises. He also stated that Jessica whips TL1 a lot and is mean to both of them. At the time, the youth court suspended Jessica's visitations with the children after this weekend visit.

¶12. Mays testified that CPS made referrals to support Jessica by providing in-home services. The children do not receive any monetary support, such as child support, disability, or Social Security income. The children have no relationship with the putative fathers, who have not been in contact with the children since they were taken into CPS custody. CPS attempted placement with the maternal grandmother, but this placement proved unavailing because the grandmother had a history with CPS. Accordingly, Mays testified that TL2 and TL4 were placed with a foster parent in September 2020 and August 2021, respectively; they call her "Nana." TL1 and TL3 were placed with Anna in August 2021; they call her "Mom." Mays testified that the children are "doing well, thriving"—they are healthy, happy, and have a good relationship with the foster families. At the time of the hearing, all the

6

children were in an adoptive placement except TL2, for whom the agency was exploring options.

¶13.    At the time of the hearing, Jessica had three other children (TK5, TK6, and TK7) in her custody.  Mays testified that multiple reports regarding these children had been made to CPS.  While CPS had found Jessica's home a safe environment for these children, Mays testified that adding four more children would create instability.

¶14.    Mays testified that there had been "a substantial erosion between the children" and Jessica.  Mays stated this erosion was seen in the forensic interviews in May 2023.  Further, while Jessica demonstrated a willingness "at times" to support and care for her children, her "lack of protective capacities and . . . stability" showed she could not care for them.  Jessica also had "an excessive history with CPS and multiple reports against her."  Jessica had held numerous jobs during this time and lived in many places.  Jessica was also inconsistent with her mental health treatment.  She had failed to comply with her family service plan and had been given ample time to reunite with her children.  In Mays's opinion, Jessica lacked "a full commitment to the responsibilities of parenthood," and adoption was in the children's best interests.  She recommended that parental rights should be terminated.

*Jessica's Testimony*

¶15.    Jessica testified in opposition to the petition to terminate her parental rights.  She admitted that by the end of 2019, five of her children at the time (TL1, TL2, TL3, TK5, and TK6) were in CPS custody.

¶16.    Jessica testified about the two injuries TL1 sustained in 2019.  The first one was an

7

eye injury sustained during a visit with his father in April 2019. When TL1 returned home, Jessica noticed his eye was bleeding; so she took him to the hospital, where she was told "he had pulled a blood vessel or something." Jessica was not sure how the injury happened because she was not there; Jordan "was watching him." A report stated that the injury occurred when TL1 was "on an elevated surface in a car chair" that fell over. CPS investigated, but Jessica claimed "nothing came back." In November 2019, TL1 sustained another injury while in the father's care. Once home, Jessica noticed that TL1 was dragging his right leg while crawling. TL1 was taken to Merit Hospital in Hattiesburg, where he was diagnosed with a broken femur.

¶17.   In 2019, Jessica was living in a two-bedroom apartment in Forrest County. After TL1's second injury, CPS advised Jessica to move to another apartment so the boys and girls would have separate rooms. Jessica moved to a three-bedroom house in Jones County, where she lived with Jordan, TK4, TK5, and TK6—the latter two children having been returned to her custody in the summer of 2020. From April to September 2020, Jessica worked sixteen-hour shifts on the weekends at a nursing home. In August 2020, Jordan moved out, leaving Jessica with childcare and financial problems. Jessica testified that she could no longer work because she could not find a babysitter, and she could not pay her bills because she no longer worked. Jessica admitted that at this point, her home instability began. In September 2020, a CPS home inspection occurred when Jessica was packing to move to Pike County. The social worker found the home unsafe due to moving boxes and uncleanliness. Jessica admitted that the social worker found animal feces and urine on the

8

floor. At this time, TL4, TK5, and TK6 were removed from the house due to child endangerment.

¶18. In September 2020, Jessica moved to Pike County, where she lived with her aunt. Without custody of any children, Jessica was able to work the day shift at McDonald's and the night shift at a nursing home, trying to afford her own place to live. In October 2020, Jessica moved into a three-bedroom house, but she had to move out because her landlord did not accept government assistance. She moved to another three-bedroom house but had to move out because the landlord sold the unit.

¶19. Jessica testified that in October 2020, she quit her job at McDonald's because her social worker was concerned about her mental stability from lack of rest due to working long hours at two jobs, as well as Jessica's ability to care for her children when working the night shift at the nursing home. Therefore, in December 2020, Jessica left her job at the nursing home. In January 2021, she began employment as a personal care assistant with better hours at another nursing home, but the pay was lower. In April 2021, TK5 and TK6 were returned to her custody. In May 2021, Jessica quit her job at this nursing home as well. Jessica testified that she did not work from May through August 2021. She gave birth to TK7 in September 2021 and began working from home "for Medicaid." This job gave her flexibility to care for the children in her custody; however, she became bored with the job and quit after one month. In November 2021, Jessica began work as a delivery driver for FedEx and maintained this job for two years. Jessica testified that in July 2023, she quit the FedEx job because it made her tired and depressed. In September 2023, Jessica started

9

working at a mobile dental service. At the time of the termination of parental rights hearing in November 2023, Jessica worked at the same job and was living in a three-bedroom apartment with TK5, TK6, and TK7. She testified that there was room in the apartment for her other four children if she regained custody of them.

¶20.     Jessica testified about her May 2023 weekend visit with TL1 and TL3 when TL1 was injured. On May 15, 2023, Anna contacted her when TL1 returned to his foster home with a bruise on his forehead. Jessica denied knowledge of any injury over the weekend. Anna also found an area on the top of TL1's head, where it appeared "somebody had pulled his hair." Jessica again denied knowledge of TL1's injuries and claimed that none of the other children injured him.

¶21.     CPS assisted Jessica in receiving mental health treatment for depression through Pine Belt in Jones County at the beginning of her case. However, she did not complete treatment because she did not find it beneficial. Jessica admitted that CPS had not given her permission to stop treatment.

¶22.     Jessica also admitted that she provided CPS with fraudulent employment verification by presenting a fake check stub around the end of 2021. Additionally, Jessica did not disclose to CPS her pregnancy with TK7. Financially, Jessica testified that she has $140 left at the end of the month after her bills are paid. She receives food stamps and housing assistance. She acknowledged that from 2019 until 2023, life has been an "up and down roller coaster" for her children.

     *Anna's Testimony*

10

¶23.    Anna, the foster mother of TL1 and TL3, was the last witness.  She works as a social worker.  Anna testified about TL1's injuries after the May 2023 weekend visit with Jessica.  He had a "little mark" at his hairline and told Anna he did not know how he became injured.  However, TL3 told Anna that TL1 "hit his head on the wall."   Later, TL1 started complaining that his head hurt.  Anna found the spot on his scalp.  Anna took TL1 to the doctor.  TL1 told the doctor he was injured by a car door.  Anna testified that TL1 was not injured at her house.[9]

*GAL Report*

¶24.    In January 2024, the GAL filed her report with the youth court.  She explained that TL1was taken into CPS custody in November 2019 due to "unexplained physical injuries"; TL2 and TL3 were taken into custody due to "sibling risk."  TL4 came into CPS custody in September 2020 due to neglect.

¶25.    The case file indicated TL1 was taken to the emergency room between April 28, 2019, and May 19, 2019 for "further evaluation of a fall."  Jessica had reported that TL1 was in his car seat, arched his back, and tumbled over the side, hitting his face.  She was not in the room when it occurred but heard it.[10]  Jessica noticed bruising on the side of his face and bleeding from one eye.  TL1 was admitted to the hospital for further monitoring and testing.

---

[9] Towards the end of the hearing, Taylor appeared, wanting to oppose the termination of his parental rights to TL2.  Since CPS had already presented its case to terminate his rights, the youth court bifurcated the proceedings as to Taylor.  His hearing was scheduled for December 19, 2023; however, he did not appear, and no further evidence was presented.

[10] This account contradicts Jessica's own testimony at the hearing that she was not present at all.

¶26. The GAL report noted that in November 2019, TL1 was examined by Dr. Scott Benton, a child-abuse pediatrician. Dr. Benton documented:

> TL1 was seen on 5/20/2019 by NP Wendi Nopper. I reviewed the case and wrote then, 'History from mother of fall out of car seat. Trauma evaluation with several fractures, facial bruising that is inconsistent with history in both timing and mechanism. Fractures are 6-8 weeks old. Given late healing stages it is not possible to reconstruct fracture mechanisms. I agree with the findings and recommendations.' Finding was physical abuse. Today, presents with history of hurting leg in a crib a week ago. X-ray with subacute transverse right femur fracture. By history, this represents medical neglect at a minimum. There is no evidence of bone disease. There is no identifiable accidental event to explain fracture. Given multiple past fractures and this incident, I reaffirm my grave concern that this is an abused child and he and his siblings should be protected.

TL1, TL2, and TL3 were then placed in CPS custody.

¶27. Regarding Jessica's employment history, the GAL report stated "[t]hroughout the life of the case, [Jessica] has shown great instability in employment. She has had over six different employers since the case has been opened." Additionally, "[d]ishonesty was prevalent in the case." Jessica provided a "fake check stub" to CPS to verify employment at a personal care home. The report stated Jessica's income fluctuated due to her frequent job changes. While Jessica received support in budgeting, "her finances never would increase to a salary that would support four (4) additional children." Her numerous "abrupt moves" across three counties (Jones, Forrest, and Pike Counties) further led to "instability in the home environment and protective capacities." The report noted that in 2023, Jessica had moved twice.

¶28. The report also noted that "[a]s the case progressed, the agency attempted to implement weekend visitation." However, TL1's injuries "gave grave concerns for

12

[Jessica's] protective capacity to keep the children safe from harm." The report referred to TL1's forehead and scalp injuries, as well as the forensic interview in May 2023, when TL3 disclosed that Jessica had "whoop[ed]" him with a "flash lighter" that left marks on him. Jessica was also inconsistent with her mental health treatment for depression.

¶29.    The GAL reported that she had been highly involved in family team meetings, youth court hearings, visits with the children, and visits to Jessica's home. She found the "parent-child bond between [Jessica] and the four children has been [severely] eroded due to the sporadic periods where [Jessica] would do well and visit" and the times when she would not visit. Overnight visits often "spark[ed] allegations of maltreatment when the children arrived back to placement." Additionally, she noted that TL1 and TL3 "have now identified [Jessica] as the person who has physically harmed" TL1. The GAL stated "reintroduc[ing] the children back to [Jessica] as a custodial parent would be detrimental to the[ir] emotional stability."

¶30.    The GAL observed that each time she visited Jessica's home, trash was "both inside and outside" the home. "The properties appeared to be unkept." The GAL stated the length of time the case has been open is "significant." There were allegations of fighting with family members who were once identified as family support. The GAL found Jessica's "transient lifestyle" was not in the best interest of the children under the totality of the circumstances. The four children should be "legally freed for adoption" and all biological parental rights terminated, according to the GAL.

### Judgment Terminating Parental Rights

13

¶31. The February 12, 2024 judgment found that CPS had "made reasonable efforts over a reasonable period of time to diligently assist Respondents[11] in complying with the service plan, but that Respondents [had] failed to substantially comply with the terms and conditions of the plan, and that reunification [was] not in the best interests" of the four children.[12] "[T]ermination of Respondents' parental rights is appropriate because reunification between Respondents . . . and Minor Petitioners . . . is not desirable toward obtaining a satisfactory permanency outcome based on one or more of the grounds set forth in Sections 93-15-119 or 93-15-121."[13] The youth court found the following grounds for terminating parental

---

[11] The Respondents were Jessica, Jordan, Taylor, and the unknown putative father.

[12] TL1, TL2, TL3, and TL4 were the minor petitioners.

[13] Section 93-15-119(1) provides the grounds for involuntary termination of parental rights and the standard of proof:

> (1) A court hearing a petition under this chapter may terminate the parental rights of a parent when, after conducting an evidentiary hearing, the court finds by clear and convincing evidence:
>
> > (a)(i) That the parent has engaged in conduct constituting abandonment or desertion of the child, as defined in Section 93-15-103, or is mentally, morally, or otherwise unfit to raise the child, which shall be established by showing past or present conduct of the parent that demonstrates a substantial risk of compromising or endangering the child's safety and welfare; and
> >
> > (ii) That termination of the parent's parental rights is appropriate because reunification between the parent and child is not desirable toward obtaining a satisfactory permanency outcome . . . .

Miss. Code Ann. § 93-15-119(1)(a) (Rev. 2021). Section 93-15-121 lists numerous grounds for termination of parental rights, to be established by clear and convincing evidence. Miss. Code Ann. § 93-15-121 (Supp. 2024).

14

rights under the statutes: Respondents (1) "engaged in conduct constituting abandonment or desertion" of the children and were "mentally, morally, or otherwise unfit to raise" the children; (2) were "unwilling to provide reasonably necessary food, clothing, shelter, or medical care" for the children; (3) "failed to exercise reasonable visitation or communication" with the children; (4) "neglectful conduct [had] caused, at least in part, an extreme and deep-seated antipathy by [the children] toward the parents"; (5) "neglectful conduct" had caused, in part, "a substantial erosion of the relationship between the parents and [children]"; and (6) had "committed an abusive act for which reasonable efforts to maintain the children in the home would not be required . . . , or a series of physically, mentally or emotionally abusive incidents, against the children . . . making future contact . . . undesirable." Miss. Code Ann. §§ 93-15-119, -121. Finally, the youth court found by clear and convincing evidence that it was in the best interest of the children for parental rights to be terminated for them to be eligible for adoption.

## STANDARD OF REVIEW

¶32. The standard of review for termination of parental rights is limited. "The judge's findings of fact are viewed under the manifest error/substantial credible evidence test." *S.F. v. Lamar Cnty. Dep't of Child Prot. Servs.*, 373 So. 3d 985, 987 (¶8) (Miss. 2023). The reviewing court "asks not how it 'would have decided the case *ab initio* but whether . . . credible proof' exists to support the judge's findings of fact 'by clear and convincing evidence.'" *Id.* (quoting *Ethredge v. Yawn*, 605 So. 2d 761, 764 (Miss. 1992)). The appellate court "gives deference to the youth court's findings of fact." *Id.* (quoting *G.Q.A.*

*v. Harrison Cnty. Dep't of Hum. Servs.*, 771 So. 2d 331, 335 (¶14) (Miss. 2000)). An appellate court will not overturn a judge's "findings of fact when supported by substantial evidence unless an erroneous legal standard is applied or is manifestly wrong." *Denham v. Lafayette Cnty. Dep't of Child Prot. Servs.*, 356 So. 3d 173, 181 (¶32) (Miss. Ct. App. 2023) (quoting *Smith v. Doe*, 314 So. 3d 154, 162 (¶26) (Miss. Ct. App. 2021)).

## DISCUSSION

### I.      Reasonable-Efforts-at-Reunification Requirement

¶33.    Jessica argues that the youth court erred in finding CPS exercised "reasonable efforts" in attempting to reunify her with the four children at issue. She claims it was error for the youth court to modify her permanency plan from reunification to termination of parental rights/adoption because she complied with all the terms of her family service plan. She also contends the youth court's findings were not supported by substantial evidence. Forrest County CPS counters that this Court does not have jurisdiction to review the youth court's findings because Jessica failed to appeal the proper orders, thus contending this issue is procedurally barred.

¶34.    On March 1, 2022, the youth court entered review hearing orders for each child after a hearing the same day, changing the permanency plan from reunification to adoption. The orders indicate Jessica was represented by counsel at this March 1 hearing, as she had been since the disposition hearing in April 2020.[14] The orders noted the "reasonable efforts"

---

[14]   Jessica's court-appointed attorney, however, moved to withdraw in May 2022 because Jessica had no contact with her except at the hearings and family meetings. For a period of time, no attorney was listed for Jessica on the review and permanency orders, but by at least July 2023 until the November 2023 hearing, the record shows Jessica was

16

made by Forrest County CPS for the prior permanency and concurrent plans. For reunification, CPS had "maintained contact with Jessica and encouraged compliance with tasks and goals on her service agreements," as well as "facilitated a family team meeting." For TL4, the youth court noted CPS "gained extensive knowledge of the mother's financial situation." Regarding the prior concurrent plan of "durable legal custody or legal guardianship," the youth court found CPS had made "reasonable efforts" to seek "relative placement and explored possible durable legal custody with the foster placement." However, the court now found "reunification with a parent or primary caretaker" was "no longer appropriate and not in the best interest" of each child. Also, the concurrent plan for each child changed to "reunification with a parent or primary caretaker." No mention was made in these March 2022 orders that they were in any way final orders or adjudications of the cases.

¶35. In fact, approximately every six months thereafter, from March 2022 until May 2023, the youth court held review hearings and entered subsequent review hearing orders in accordance with the Uniform Rules of Youth Court Practice, tracking Jessica's progress and CPS's assistance. The permanency plan remained adoption, but the concurrent plan remained reunification. A September 2022 review hearing order noted CPS was working on obtaining "the last necessary documents" for the termination of parental rights petition. During this time, the youth court conducted two permanency hearings and entered orders on October 11, 2022, and July 25, 2023.

---

represented by counsel.

17

¶36.   On July 26, 2023, Forrest County CPS filed a petition to terminate parental rights. After a hearing on November 17, 2023, the youth court entered a judgment terminating Jessica's parental rights on February 13, 2024, and Jessica timely appealed from this judgment.

### A.    Jurisdiction

¶37.   Forrest County CPS argues that Jessica should have appealed the March 1, 2022 review hearing orders that changed the permanency plan to adoption, or alternatively, she should have appealed any one of the many subsequent review-hearing or permanency orders.[15]   Because she did not appeal but, instead, waited until after the termination of parental rights hearing and judgment in February 2024, CPS contends that this Court lacks jurisdiction to hear her first issue.  We disagree.

¶38.   Section 43-21-651(1) (Rev. 2021) of the Mississippi Code provides that "appeals may be taken from final orders or decrees of the youth court" to the Mississippi Supreme Court. This statute was amended during the 2024 Regular Session of the Mississippi Legislature to "clarify the right of appeal from youth court." 2024 Miss. Laws ch. 531, § 11 (S.B. 2792) (effective July 1, 2024).  While passed by the Legislature but not yet in effect at the time this appeal was filed, the amended statute gives some guidance as to what constitutes a "final order" for appeals from youth court:

---

[15] Forrest County CPS claims Jessica should have appealed from any of the following youth court orders that discussed CPS's "reasonable efforts" after the permanency plan changed to adoption: (1) the March 1, 2022 Review Hearing Orders; (2) the subsequent Review Hearing Orders entered on April 19, 2022; September 6, 2022; January 3, 2023; February 28, 2023; April 18, 2023; and October 17, 2023; or (3) the permanency orders of October 11, 2022, and July 25, 2023.

> The court to which appeals may be taken from final orders or decrees of the youth court shall be the Supreme Court of Mississippi pursuant to the Rules of Appellate Procedure. Final Orders in youth court include orders that grant durable legal custody or durable legal relative guardianship, transfer jurisdiction over the minor child to another court, such as for an adoption, or otherwise terminate the jurisdiction of the youth court over the minor child. *All factual findings, legal determinations, and adjudication of issues by the youth court prior to the time the final order is entered are preserved for appellate review and any common law to the contrary is expressly abrogated. Any matters adjudicated by the youth court through interim orders such as adjudication/disposition orders, or permanency review orders, may be only appealed through the interlocutory appeal process provided by the Rules of Appellate Procedure.*

Miss. Code Ann. § 43-21-651(1)(a) (Supp. 2024) (emphasis added). Under the above statute, "permanency review orders" are interlocutory in nature and not final. Further, all the issues, including CPS's reasonable efforts at reunifying the family, were preserved for appellate review. Finally, "any common law to the contrary" of this statute is "expressly abrogated."

¶39. In support of its argument that the March 1, 2022 review hearing and other orders were final and appealable, Forrest County CPS cites *In re L.C.*, 394 So. 3d 517, 528 (¶29) (Miss. Ct. App. 2024). After adjudicating the children neglected and placing them in CPS custody, the youth court found the permanency plan of reunification with the biological mother was best and ordered CPS to make reasonable efforts to that effect. *Id.* at 520 (¶6). However, like here, over a year later, "[t]he course of the case changed dramatically." *Id.* at 522 (¶12). A final permanency hearing was held where CPS and the GAL recommended that the permanency plan be changed from reunification to adoption for one child. *Id.* at

19

522-23 (¶12).[16] Upon the mother's motion, the youth court entered detailed findings of fact and conclusions of law. *Id.* at 525 (¶19). A week later, the court entered an amended permanency plan order, changing the plan from reunification to adoption and specifically ordering CPS to begin the termination of parental rights process. *Id.* at 527 (¶27). The mother appealed from this order. *Id.* Nothing further in the opinion addressed the termination of parental rights hearing or judgment.

¶40. While neither party challenged jurisdiction in *In re L.C.*, the dissent argued that the youth court's amended permanency order was not a final, appealable order. *Id.* at (¶28); *id.* at 534 (¶53) (Westbrooks, J., dissenting). The dissent noted that the youth court's "Findings of Fact and Conclusions of Law" indicated that it would take further action once the [termination of parental rights] petition was filed and the requisite evidence was presented." *Id.* at 536 (¶58). Because the youth court would take "further action" after the permanency order, the dissent found the amended permanency order was not a final, appealable judgment under common law. *Id.* at 535-36 (¶¶56-58). While the dissent cited section 43-21-651, it correctly noted that the statute's amendment did not apply in that case because the appeal occurred two years before the statute's effective date. *Id.* at 535 n.22. In contrast, the majority, citing common law, concluded that the amended permanency order was final "because it disposed of all issues before the court, ordered [CPS] to commence a [termination of parental rights] proceeding against [the mother], and left no issue unsettled." *Id.* at 527 (¶28).

---

[16] The opinion indicates the permanency hearings were transcribed for the record, unlike here.

20

¶41. In light of the amended section 43-21-651(1)(a) "clarifying" what constitutes a "final" order in youth court, even though the amendment did not go into effect until four months after this appeal was filed, the amendment supports this Court's having jurisdiction. In *In re L.C.*, this Court concluded it had jurisdiction, heard the case on the merits, and reversed in favor of the parent who appealed the youth court decision prior to a final termination of parental rights. *Id*. at 530, 534 (¶¶37, 51). Here, we find, to the extent our holding conflicts with *In re L.C.*, it is better to hear the merits of this termination-of-parental-rights case, rather than dismissing the case for lack of jurisdiction, as the amended (or "clarified") statute would allow the appeal. The clarification indicates that the Legislature did not agree with the common law procedure that this Court previously advanced. We conclude that the review and permanency orders cited by Forrest County CPS are not final, appealable orders, and Jessica properly appealed the termination of parental rights judgment.

## B. CPS's "Reasonable Efforts"

¶42. The youth court must find CPS made "reasonable efforts" to achieve the original permanency plan of reunification before modifying the plan to adoption and termination of parental rights. *In re L.C.*, 394 So. 3d at 531 (¶40) (citing Miss. Code Ann. § 43-21-613(3)(a)(ii) (Rev. 2021)). Additionally, section 93-15-115(c) of the Mississippi Code provides that the youth court must conduct a "permanency hearing, or a permanency review hearing," and find CPS "has made reasonable efforts over a reasonable period to diligently assist the parent in complying with the service plan." The Mississippi Code defined

21

"reasonable efforts" in the context of youth court law as

> the exercise of reasonable care and due diligence by the Department of Human Services, the Department of Child Protection Services, or any other appropriate entity or person to use appropriate and available services to prevent the unnecessary removal of the child from the home or provide other services related to meeting the needs of the child and the parents.

Miss. Code Ann. § 43-21-105(gg) (Supp. 2019).

¶43. Jessica contends that she complied with her family service plan, yet her parental rights were still terminated. She claims CPS failed to exercise reasonable efforts to reunify the children with her, and the youth court erred in changing her permanency plan to termination of parental rights/adoption.

¶44. The family service plan, which Jessica entered into in November 2019, was admitted as an exhibit during the termination of parental rights hearing. CPS monitored her progress throughout the case. Jessica contends that she maintained stable employment and housing under the plan. We disagree. The plan stated Jessica was to maintain verifiable employment with an income that would sustain her family's needs. Jessica failed to achieve that goal. The record shows Jessica changed jobs frequently over the duration of the case, and she ultimately never obtained a job that would support her and her seven children.

¶45. The GAL report stated that over the life of the case, Jessica showed "great instability" in employment. We agree. She has had numerous employers since 2019. In August 2020, when Jordan moved out, Jessica admitted her instability began because she could not keep up with her bills and lacked childcare. By September 2020, with no children in her custody, she worked at two jobs, day and night, at McDonald's and a nursing home, but she was

22

unable to maintain this schedule. By the end of 2020, Jessica had quit both jobs. In early 2021, she began working at another nursing home with better hours but lower pay. By May 2021, she was pregnant with TK7 and had quit her current job. After giving birth, in September 2021, Jessica obtained a job working from home "with Medicaid," which helped greatly with childcare, but she found it boring and quit soon after starting.

¶46. Jessica points to sustaining her employment with FedEx as a delivery driver for two years starting in November 2021; however, her hours were not always conducive to childcare, and by July 2023, Jessica quit the job. In September 2023, Jessica started working at a mobile dental clinic with better hours.

¶47. Importantly, the GAL report and CPS progress notes show "dishonesty was prevalent" in this case, especially about employment.[17] Jessica provided CPS with a fraudulent check stub for one of her nursing home jobs. Because Jessica changed jobs frequently, her income fluctuated, and her salary never increased to a level that would support the four additional children, who received no other monetary support besides Jessica's income.

¶48. Regarding housing, the service plan stated Jessica was to maintain stable housing and have "proper sleeping arrangements for the children. The home must be free of outside and inside debris and construction materials" as well as "clutter." On appeal, Jessica minimizes her frequent moves, but the record shows Jessica's housing was far from stable. When the case began, Jessica was living in a two-bedroom apartment in Forrest County; however, CPS

---

[17] Jessica was also dishonest about her pregnancy and birth of TK7.

advised Jessica to find a three-bedroom apartment so the boys and girls would have separate rooms. In November 2019, Jessica moved to a three-bedroom house in Jones County. In August 2020, Jessica's home was found unsafe due to packing boxes, inadequate sleeping arrangements, and pet excrement. At this point, TL4 was removed from her home due to neglect, and Jessica moved in with her aunt, without her children. In October 2020, Jessica moved several times trying to stay in three-bedroom apartments. The GAL report described her lifestyle as "transient."

¶49. Initially, one of the reasons Jessica's children were removed from her custody was lack of proper sleeping arrangements. Later, TL4 was removed from her home because the infant had nowhere to sleep, and the house was deemed a dangerous environment for children. Moreover, on visits, the GAL witnessed trash inside and outside Jessica's properties, which she described as "unkept." At the time of the hearing on the termination of parental rights, although Jessica's home was deemed safe (with three children in her custody), May testified that adding four more children would create instability.

¶50. In support of Jessica's position that she complied with the family service plan, she points to passing drug tests, completing parenting classes, and complying with visitations with her children until CPS "abruptly stopped" them in May 2023. Visitation stopped, however, because of the injuries TL1 sustained during the weekend visit in Jessica's care. These injuries then precipitated the forensic interviews with TL1 and TL2, where they complained of maltreatment by Jessica.

¶51. CPS had worked with Jessica since November 2019, exercising "reasonable efforts"

24

in an attempt to reunify her with her children. For the first two years, the CPS progress notes indicated Jessica was trying to comply with the plans and moving toward reunification. CPS was diligently assisting Jessica by arranging numerous services: mental health treatment for her depression, parenting classes, visitations, and in-home services. However, in September 2021, CPS noted that Jessica had become "chronically dishonest to the agency which is causing major issues in her case." Then, in March 2022, CPS noted, "Jessica continues to be apathetic and have little motivation to do what she needs to do to get her children back," and "Jessica is her own barrier to reunification due to her continuing to be dishonest with the agency and being unstable with her housing and finances." Further, the GAL stated that the relationship between Jessica and her children had eroded due to her sporadic visits.

¶52. We conclude that the youth court properly found CPS exercised reasonable efforts over time to assist Jessica in reunifying with her four children. Even so, Jessica failed to meet the terms of her family service plan. Accordingly, the youth court did not err in changing the permanency plan from reunification to termination of parental rights/adoption.

## II. Ineffective Assistance of Counsel

¶53. Next, Jessica, through new counsel on appeal, claims her appointed counsel at the termination of parental rights hearing on December 19, 2023, was ineffective because he did not allow Jessica in the courtroom. However, she acknowledges that claims of ineffective assistance of counsel in civil cases are usually remedied by legal malpractice claims or bar complaints. Further, Jessica contends that she "was not allowed to testify nor present any

evidence" at the termination of parental rights hearing, which is untrue. This issue lacks legal authority and is based on factual inaccuracies.

¶54.   The Mississippi Supreme Court has expressly held that the Sixth Amendment, by its express terms, "limits its own application to 'criminal prosecution,' [and] does not apply to civil proceedings." *Miller v. Smith*, 229 So. 3d 100, 105 (¶22) (Miss. 2017). Mississippi courts have not specifically "addressed whether the Sixth Amendment's right to effective assistance of counsel extends to proceedings involving the termination of parental rights." *Denham v. Lafayette Cnty. Dep't of Child Prot. Servs.*, 356 So. 3d 173, 183 (¶39) (Miss. Ct. App. 2023). Further, our supreme court has held that "the constitutional right to effective assistance of counsel does not apply to a civil proceeding." *DeMyers v. DeMyers*, 742 So. 2d 1157, 1162 (¶20) (Miss. 1999); *see also Adams v. Rice*, 249 So. 3d 463, 472 (¶35) (Miss. Ct. App. 2018) ("The Sixth Amendment right to effective assistance of counsel is triggered in criminal proceedings, not family-law matters."). Jessica cites no authority in support of her argument.

¶55.   Under Mississippi caselaw, there is no Sixth Amendment right to effective assistance of counsel in civil cases, including termination of parental rights cases. Such cases are civil in nature, despite the separate opinion's suggestion that they are not. Jessica was entitled to appointed counsel, which she received. Nothing in the record indicates that he was not competent.

¶56.   Jessica's argument is based on factual inaccuracies. Both she and her appointed counsel were present at her termination of parental rights hearing, which was held on

26

November 17, 2023. Jessica testified at length, and her counsel effectively cross-examined CPS's witnesses. The hearing of December 19, 2023, where Jessica claims her counsel was ineffective for not allowing her in the courtroom, was not Jessica's hearing, but Taylor's bifurcated termination of parental rights hearing. However, Taylor failed to appear, and no further testimony was taken. There is no other information in the record about Taylor's hearing.[18]

¶57. Even if the Sixth Amendment right to effective assistance of counsel applied to termination of parental rights hearings, Jessica's argument is without merit. In order to establish a successful claim of ineffective assistance of counsel, "the defendant must show that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Jessica fails to show, nor do we find, any deficient performance by her counsel that prejudiced her termination of parental rights hearing.

## CONCLUSION

¶58. The youth court's judgment terminating Jessica's parental rights was based on substantial evidence. The youth court properly found that CPS made reasonable efforts to reunify the four children with Jessica. There is no merit to Jessica's argument regarding her counsel's performance at the termination of parental rights hearing. Accordingly, we affirm the youth court's judgment.

---

[18] The separate opinion states that Jessica "was entitled to appointed counsel." To be clear, we agree. Jessica had appointed counsel at her termination of parental rights hearing. However, Jessica's appellate argument is mistakenly based on Taylor's December 2023 hearing where Taylor failed to appear, and no hearing took place.

¶59. **AFFIRMED.**

**LAWRENCE, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. CARLTON, P.J., AND McDONALD, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WILSON, P.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. McCARTY, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS, J.; McDONALD, J., JOINS IN PART.**

**McCARTY, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶60. Over a century before the U.S. Supreme Court recognized it, Mississippi determined that "[n]o higher evidence could be afforded of the sanctity with which our law invests the parental right of custody, or rather recognizes and protects the right given by nature and by God." *Moore v. Christian*, 56 Miss. 408, 411 (1879). In more recent years, we have called "[t]he natural parent presumption[] a bedrock principle of Mississippi family law." *K.D.F. v. J.L.H.*, 933 So. 2d 971, 980 (¶35) (Miss. 2006); *see Troxel v. Granville*, 530 U.S. 57, 65 (2000) (likewise agreeing that parents have a fundamental liberty interest "in the care, custody, and control of their children").

¶61. This liberty interest in the preservation of the family unit is "so crucial" that the Mississippi Legislature decided "that before termination of parental rights, a mother or father could be appointed a lawyer if they were indigent." *Denham v. Lafayette Cnty. Dep't of Child Prot. Servs.*, 356 So. 3d 173, 186 (¶55) (Miss. Ct. App. 2023) (McCarty, J., concurring in part and dissenting in part) (citing Miss. Code Ann. § 93-15-113 (Rev. 2021)).

¶62. As a part of the termination of parental rights law, our Legislature codified that "[a]ll parents have the right to be appointed counsel in termination of parental rights hearings, and

28

[that] the court shall appoint counsel if the court makes a finding that the parent is indigent and counsel is requested by the parent." Miss. Code Ann. § 43-21-201(2)(a) (Supp. 2025); *see also* Miss. Code Ann. § 93-15-113(b) (Rev. 2021) (directing that in termination proceedings "the court shall determine whether the [indigent] parent is entitled to appointed counsel").

¶63.    The law further sets out the duties of appointed counsel.  Namely, that "[a]ttorneys for all parties, . . . shall owe the duties of undivided loyalty, confidentiality and **competent representation** to the party client pursuant to the Mississippi Rules of Professional Conduct." Miss Code Ann. § 43-21-201(4) (emphasis added); *see also* MRPC 1.1, 1.3, 1.4.

¶64.    While the majority asserts that the Sixth Amendment's right to effective assistance of counsel is limited to criminal prosecutions and does not apply to civil proceedings, we cannot pretend that termination proceedings are merely civil in nature.  Termination proceedings occur in an adversarial setting and involve the potential loss of a protected liberty interest in one's family.  And as in all proceedings brought by the State, they can be very lopsided, as the State generally has greater resources at its disposal, including investigators, caseworkers, lawyers, and experience.

¶65.    Because Jessica was facing the loss of her fundamental liberty right to her family, she was entitled to appointed counsel, and that lawyer must be reasonably effective in that duty. As expounded more fully in the separate opinion in *Denham*, "[t]his mother should not be owed less of a duty than if a lawyer had been appointed to her in a criminal case." 356 So. 3d at 188 (¶67) (McCarty, J., concurring in part and dissenting in part).

¶66. I agree with the majority that credible proof exists in the record to support the core findings by the trial court below, but I cannot agree that there is no duty of effective counsel in cases where a parent faces the termination of rights to their child. Nearly 150 years ago, our Supreme Court reckoned that "the parental right of custody" was a "right given by nature and by God." We must honor that right by ensuring parents have effective counsel.

**WESTBROOKS, J., JOINS THIS OPINION. McDONALD, J., JOINS THIS OPINION IN PART.**